## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

In Re:

**DENNIS RAY JOHNSON, II, et al.**                    **Case No. 16-30227**
                                                    **Chapter 11**
     **Debtor.**                                  **Jointly Administered**

### TRUSTEE'S MOTION FOR AUTHORITY TO COMPROMISE
### PENDING CIVIL ACTION AGAINST PEOPLES BANK,
### PEOPLES INSURANCE AGENCY, LLC, GREAT AMERICAN INSURANCE
### COMPNAY OF NEW YORK, AND ZACHARY B. BURKONS

AND NOW, comes Thomas H. Fluharty, Chapter 11 Trustee ("**Trustee**") for the bankruptcy estates of Dennis Ray Johnson, II ("**Johnson**"), Appalachian Mining & Reclamation, LLC ("**AMR**"), Green Coal, LLC ("**Green Coal**"), Redbud Dock, LLC ("**Redbud**"), Producer's Land, LLC (" **Producer's Land**"), Producer's Coal, Inc. ("**Producer**'s **Coal**"), Southern Marine Terminal, LLC ("**SMT**"), Southern Marine Services Limited Liability Company ("**SMS**"), DJWV1, LC ("**DJWV1**"), DJWV2, LLC ("**DJWV2**"), Elkview Reclamation & Processing, LLC ("**Elkview**"), Moussie Processing, LLC ("**Moussie**"), The Little Kentucky Elk, LLC ("**LKE**"), Joint Venture Development, LLC ("**JVD**") and Sabbatical, Inc. ("**Sabbatical**") all administratively consolidated at case number 3:16-bk-30227 ("**Johnson Case**") before the United States Bankruptcy Court for the Southern District of West Virginia ("**Bankruptcy Court**"), by and through counsel, and files this *Motion for Authority to Compromise the Civil Action Against Peoples Bank, Peoples Insurance Agency, LLC, Great American Insurance Company of New York, and Zachary B. Burkons* pending in the United States District Court for the Southern District of West Virginia.

The Trustee seeks authority to: 1) enter a compromise with Peoples Bank that provides for a complete mutual release of claims, a contribution to the estate from Peoples Bank to allow

for the reorganization of the Dennis R. Johnson, II bankruptcy case, and resolves and allows certain claims held by Peoples Bank via a mutually agreeable plan to be filed by the Trustee and Peoples Bank; 2) enter a mutual release of claims with Peoples Insurance Agency; and 3) authorize the compromise of SMT's claim against Great American Insurance Company for the sum of $55,000.00. On April 24, 2018, the District Court dismissed Defendant Zachary Burkons based upon the District Court's lack of jurisdiction. Upon approval by this Court of the compromise, appropriate pleadings will be filed with the United States District Court.

**JURISDICTION AND VENUE**

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1134.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      Sections 105(a) and 363 of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure ("<u>Bankruptcy Rules</u>") govern the relief requested in this Motion.

**FACTUAL BACKGROUND**

3.      On October 26, 2017, the Trustee by Special Counsel filed Civil Action 3:17-cv-04220 on behalf of the bankruptcy estates of Johnson, DJWV2, SMS, SMT, Redbud, Green Coal, AMR, Producer's Land, Producer's Coal, and JVD against Defendants Peoples Bank, Peoples Insurance Agency, LLC, Great American Insurance Company of New York, and Zachary B. Burkons in the United States District Court for the Southern District of West Virginia ("**Civil Action**").

<u>**Allegations Against Peoples Bank**</u>

4.      In the Civil Action, the Trustee alleged that from 2011 through 2014, Peoples Bank, through its loan officer Robert Van Nostrand, made various secured loans to Plaintiffs

2

totaling approximately $19,000,000. The Complaint asserts that in the course of these financing transactions (and through Johnson's prior dealings with Van Nostrand while Van Nostrand was employed at other banks), Johnson and Van Nostrand developed a confidential and special relationship which Peoples Bank utilized to its advantage and to the detriment of Johnson. Specifically, the Complaint asserts that based upon intentional misrepresentations of Bank employees, the withholding of key information including appraisals, and representations by Van Nostrand that the Bank intended to offer Johnson long term refinancing to cure loan defaults, the Bank fraudulently induced Johnson to provide the bank with additional collateral and to enter into an unfavorable forbearance agreement providing for guarantees and cross collateralization of the assets of the Plaintiffs.

5.      The Trustee alleged in his complaint that the Bank did not follow through with the financing and instead required Johnson to pursue an asset sale under the supervision and control of the Bank and that the Bank's board of directors ultimately rejected the proposed asset sale. As a result of these acts and the Bank's offset against insurance monies due and negligence in the receivership actions, the Trustee alleged that the Debtor lost the entirety of his coal enterprise. The Trustee sought damages equal to the value of the coal entities as established by the Bank's appraisals ($70 million) plus punitive damages under theories of breach of fiduciary duty, fraudulent inducement, fraudulent conveyance, tortious interference, unlawful setoff, contempt, negligence, and RICO violations.

6.      The Trustee further alleged that Johnson's initial default under the Peoples Bank loans was caused by the nefarious acts of Johnson's former business partner, Mark Pinson. Specifically, based upon representations by Johnson to the Trustee, the Trustee alleged that Mr. Pinson misrepresented to Johnson and Peoples Bank the quality of coal inventory securing

Peoples Bank's loans. Van Nostrand informed the Trustee that he became aware of the coal inventory deficiency in 2014 when Johnson's coal entities were unable to deliver coal to Cargill. Specifically, Van Nostrand explained that the Cargill coal located at Johnson's dock facility did not meet the Cargill specifications required to ship. As a result, Van Nostrand advised Johnson to stop shipping coal and advised Peoples Bank that Producer's Coal would have a second quarter 2014 loss of $2-3 million. Van Nostrand further explained that by early 2015, Producer's Coal loan balances were $6 to $8 million more than the value of the coal collateral. The Trustee relied on the representations of Johnson and Van Nostrand in drafting his complaint.

7.      After Johnson's loan defaults, People's Bank sought additional collateral. In his Complaint, the Trustee asserts that Van Nostrand represented to Johnson that the additional collateral along with favorable appraisals of the coal enterprise would support the extension of a new 10-year loan. To provide further incentive for a long-term refinancing, the Bank encouraged Johnson to obtain legal control of the environmental mining permits of the various coal entities, which were being held in entities owned by Johnson's father. Johnson subsequently caused his father to transfer the permit entities to Moussie Processing, LLC, an entity controlled by Johnson.  Johnson thereafter met with the Bank and informed it that he had control of the mining permits.

8.      Peoples Bank disputed the Trustee's allegations on factual and legal grounds.

**Information Obtained by Trustee After Filing of Civil Action
and Grounds for Dismissal of Peoples Bank**

9.      In December 2016, the Trustee discovered that within a matter of weeks following the transfer of the permit holding entities to Moussie Processing, Johnson's father, who has the same name, but different DEP registration number than Johnson, filed sworn affidavits of ownership and control with the Kentucky Division of Mine Permits in which

4

Johnson's father attested that he owned and controlled the permit entities and therefore the permits. The Trustee asked Johnson to explain why the affidavits were filed. The question is material to the Trustee because Johnson was attempting to block the Trustee's sale of the Little Kentucky Elk mine permit on the grounds that only the responsible officer listed on the permit, Johnson's father, could execute an assignment of the permit. Johnson had previously represented that the permits were freely transferrable by the Trustee. In response to the Trustee's question, by email dated December 28, 2016, Johnson represented to the Trustee that he had not seen the affidavits and that his father had met with Tonya Johnson (no relation) who served as Johnson's mining engineer and that Tonya Johnson and his father executed the affidavits. **See Exhibit A**. The Trustee subsequently retained Tonya Johnson to assist the estate with environmental permit compliance. On March 20, 2018, Ms. Johnson informed the Trustee that the email statement made by Johnson to the Trustee was false, that Tonya Johnson did not meet with Johnson's father, that Tonya Johnson prepared the affidavits at the request of Dennis Johnson and that she emailed the affidavits to Johnson for signature by his father. Ms. Johnson further stated that the affidavits should not have been filed with Kentucky and that they were done so at the request of Johnson. The Trustee has worked with Tonya Johnson for over a year and has no reason to doubt her truthfulness or credibility. Based upon the foregoing, the Trustee believes that Johnson intentionally misrepresented to Peoples Bank that he had control of the mining permits. Further, Mr. Johnson's misrepresentations to the Trustee raise material questions of credibility that impact the viability of the Civil Action.

10.     In early May 2017, the Trustee learned that an entity named TJDB, which was, at least on its face created and owned by Sabbatical's dock manager Dewey Webb, had sold approximately 30,000 tons of coal to Noble Energy during the period of August through

December 2016 for the sum of $1.2 million. Peoples Bank discovered the sale through a subpoena issued to Noble. On May 18, 2017, the Trustee and Peoples Bank filed an adversary proceeding against Dewey Webb and TJDB asserting that TJDB, with the knowledge and assistance of Johnson, converted assets of the estate by digging base coal at Lockwood Dock, selling the base coal to Noble Energy, with payment received by TJDB. Peoples Bank and the Trustee sought and obtained a temporary restraining order against TJDB and Webb to prohibit the expenditure of funds held by TJDB at the Bank of Inez.

11.     At the May 19, 2017 emergency hearing on the Trustee's motion for temporary restraining order, Sabbatical's counsel produced an affidavit of Dewey Webb, which was allegedly provided to Sabbatical's counsel by Johnson. In his affidavit, Webb stated that Johnson had nothing to do with TJDB and that the coal sold to Noble was coal that Webb had obtained on his own from Calgon Chemicals. Webb suggested that anyone seeking verification of his purchases, should call Calgon's sales representative.

12.     On May 22, 2017, Johnson sent an email to the Trustee and U.S. Trustee in the form of an affidavit of Johnson asserting that Peoples Bank and the Trustee misrepresented the facts alleged in the complaint. Johnson claimed in the affidavit that it only took him a couple calls and emails to disprove the allegations of the Trustee and Peoples Bank. In his affidavit, Johnson stated that Webb and TJDB obtained the coal from Calgon, that Dewey Webb had documentation to show that the coal was purchased from Calgon, that Noble paid transloading fees to Sabbatical of approximately $70,000 for using the dock as confirmed by Noble employee Gene Stone, that Sabbatical did not have the coal quality at the dock to fill Noble's order, and that there was no harm to the Sabbatical bankruptcy estate. **See Exhibit B.**

13.     In furtherance of the Bank and Trustee's investigation of the TJDB transaction with Calgon, Peoples Bank issued a subpoena to Calgon and found no contracts between TJDB and Calgon. The only contract produced was one between Sabbatical and Calgon involving carbon waste product that was given to Sabbatical by Calgon at no cost. **See Contract attached as Exhibit C**. The waste product given to Sabbatical has a very high ash content of 20% and minimal value, nowhere near the coal quality requested by Noble, meaning that the carbon waste product would only provide volume and would have to be mixed with better coal to meet minimum specifications required by Noble. **See internal emails from Calgon, Exhibit D**.

14.     In his May 22, 2017 email to the U.S. Trustee, Johnson asserted that it only took him a couple of calls and emails to get to the bottom of the issues and disprove the Trustee's complaint. This statement is clearly false and was made by Johnson to mislead the Trustee and U.S. Trustee. Johnson had a long-standing business relationship with Calgon and Noble. Noble employee Gene Stone had an office at Lockwood Dock. Calgon sales representative Cole Troutman communicated and dealt regularly with Johnson. A call to Calgon or a walk across the hall to Gene Stone's office, a review of the alleged Calgon documents held by Dewey Webb, or an inquiry directed to Sabbatical office clerk Debbie Runyon, who was copied on the emails from Calgon, would have immediately revealed that TJDB was not selling coal purchased from Calgon.

15.     According to Dewey Webb, via a letter provided to the Trustee by Webb's counsel on May 20, 2018, Johnson had asked Webb to "stick with the story that the coal came from Calgon" because Johnson was the one in bankruptcy and that Mr. Webb didn't do anything wrong. Mr. Webb further states in his letter that Johnson believed that the Trustee's lawsuit

against TJDB and Webb would be dismissed because the qualities of the coal sold to Noble do not match up with the yard coal qualities. **See Exhibit E.**

16.     The Trustee agrees that the qualities of the coal sold are important to determine the truth of the transactions.  The quality of the carbon waste product certainly does not match those requested by Noble. The "yard coal," however, does have sufficient quality to be accepted by Noble, since according to Mr. Webb, the coal that TJDB sold to Noble was dug up from Lockwood and mixed with the Calgon waste product.  **See deposition transcript of Dewey Webb at page 126, attached as Exhibit F**. Based upon the data provided by Noble, the yard coal purchased from TJDB was within the acceptable limits.  **See Exhibit G.**  Therefore, Mr. Johnson's statement in his May 22, 2017 email to the U.S. Trustee that Sabbatical did not have the coal quality to sell the coal requested by Noble is also false.  Johnson's misrepresentations as to coal quality and the source of the coal sold by TJDB raise material questions of credibility and are detrimental to the Civil Action, particularly since Johnson asserted the same defense, lack of coal quality, to explain to Van Nostrand the $2 to $3 million write-down of People's Bank coal collateral in the second quarter of 2014.

17.     Attached to the Trustee's motion for temporary restraining order, were emails dated May 25 and 26, 2016 between Noble employees (Lance Myer, Gene Stone and Matt Schicke) and Dennis Johnson and Dewey Webb. **Exhibit H**. The emails show that Noble threatened to buy less base coal from Sabbatical after the bankruptcy. In response Johnson threatened to stop loading Noble's coal. Lance Myers and Gene Stone agreed to speak with Johnson by phone. The next day, Noble's Lance Myer thanked Johnson for the phone call and stated that Noble agreed to purchase 20,000 tons of coal from Sabbatical through the end of 2016. Shortly thereafter, on June 1, 2016, Sabbatical and Noble entered into a short-term coal

sale agreement. A few weeks later, in July 2016, TJDB was formed and thereafter entered into a short-term coal sale agreement with Noble. The Trustee later discovered, after review of TJDB bank accounts, that Gene Stone received a kickback of approximately $300,000 from TJD&B.

18. In his Motion for TRO, the Trustee alleged that the May 2016 emails were the source request for the coal sold by TJDB. Pursuant to his May 22, 2017 email to the U.S. Trustee, Johnson explained that the emails attached to the Trustee's motion for TRO were instead related only to the coal sold by Sabbatical to Noble. Johnson explained that the 20,000 tons of coal sold to Noble from June through December 2016 at the rate of $35 per ton equals the 700,000 of coal inventory listed on Sabbatical's schedules. The Trustee believes that Johnson is correct in that the emails were related to the coal sale from Sabbatical to Noble. However, the Trustee also believes the TJDB to Noble coal sale also arose from these same discussions. Regardless, Johnson's statement in his May 22, 2017 email to the U.S. Trustee was the first instance where Johnson clearly and inconspicuously explained to the Trustee and U.S. Trustee that Johnson was digging up base coal at Lockwood Dock post-petition and selling that coal directly to Noble outside of the ordinary course of business.

19. At the beginning of the Trustee's involvement in the Johnson cases, but prior to his appointment as Trustee of Sabbatical, Johnson represented to the Trustee that base coal was sometimes mixed with other higher quality coal purchased by Sabbatical, which added volume and generated revenue, and that this was a standard practice in the industry. In fact, Johnson represented to the Trustee that when he purchased the stock of ACT for $6 million (ACT owned the Lockwood Dock facility), he valued the coal base at $3 million, with $2 million allocated to land and buildings and $1 million to rolling stock. Mr. Johnson, by email dated November 10, 2016, advised the Trustee that as of May 18, 2016 (Sabbatical's Petition Date), Sabbatical owed

its subsidiary ACT approximately $2 million for base coal that was sold by Sabbatical, meaning that only $1 million of base coal remained. At Sabbatical's December 2, 2016 meeting of creditors, the U.S. Trustee asked Johnson if Sabbatical still had the $700,000 of inventory listed on its schedules. Mr. Johnson stated that "we track it, but I don't know what it actually is today, it does have some inventory." Mr. Johnson agreed to provide the U.S. Trustee the current inventory. Mr. Johnson further stated to the U.S. Trustee that Sabbatical hadn't sold any coal since before the bankruptcy was filed, but that he had some coal already sold prior to the bankruptcy and that Sabbatical has just been filling that order. Peoples Bank counsel then asked if the $700,000 represented the base coal that is at Lockwood or if the $700,000 represented stockpiled coal. Mr. Johnson replied, "base coal."

20.     Apparently, the $700,000 of coal inventory listed on Sabbatical's schedules was, as of the petition date, still in the ground, part of Lockwood Dock, and remained collateral of Arch Coal. Johnson merely made an accounting entry that booked $700,000 of base coal on Sabbatical's books and which allowed Sabbatical to continue selling base coal post-petition. The Trustee notes that the June 1, 2016 short-term coal sales agreement between Noble and Sabbatical was dated June 1, 2016, approximately two weeks after the bankruptcy filing. Inventory was not reported on any of the balance sheets attached to the Monthly Operating Reports filed by Sabbatical, which would have shown the depletion in inventory/base coal during the bankruptcy and prior to the appointment of the Trustee. The Trustee further notes that Sabbatical's bankruptcy schedules listing the coal inventory were not filed until October 2016, approximately 5 months after the petition date and 4 months after the Sabbatical to Noble trade date of June 1, 2016. The June 1, 2016 trade agreement with Noble specifically recognizes the transaction as a post-bankruptcy sale. **See Exhibit I.**

21.     Regardless of whether the June 1, 2016 sale agreement with Noble was a post-etition transaction or not, the U.S. Trustee and Trustee did not understand that Sabbatical was systematically digging up the coal base and liquidating it post-petition. In fact, Sabbatical's bankruptcy counsel did not even understand that Johnson was digging up and selling base coal to Noble post-petition. **See transcript of May 19, 2017 hearing on Motion of Trustee for TRO, at page 52 and 53 and attached hereto as Exhibit J**.

22.     In January 2017, the U.S. Trustee asked Johnson to explain the 10' deep hole near the Noble stockpile, Johnson informed the U.S. Trustee that Noble was exiting the market and attempting to recover its coal which had been packed down by traffic and weather, that the coal was being turned so that it would drain and dry, and that the hole would be reclaimed through excavation.

23.     Mr. Webb has informed the Trustee that base coal was in fact being dug up and sold to Noble from that location at the dock.  **See deposition transcript of Dewey Webb at page 126, attached as Exhibit F**.

24.     The complexities of Johnson's coal operations and the slow leak of information from Johnson prevented the Trustee and U.S. Trustee from understanding in a timely manner that Johnson was liquidating the base coal during the bankruptcy. Additionally, the sale of base coal by Sabbatical to Noble, was not a transaction that a coal loading facility would undertake in the ordinary course of business; rather, it was the liquidation of the largest asset of the Sabbatical bankruptcy estate. Johnson should have obtained Bankruptcy Court approval before selling the base coal, especially since Johnson was drawing a salary of $14,000 per month from Sabbatical during the bankruptcy.

25.     Pursuant to the testimony of Sabbatical dock manager Dewey Webb, the sale of base coal by Noble to TJD&B and the distribution of those sale proceeds happened only because Johnson so directed. The Trustee understands that Mr. Webb has changed his story and has admitted to making false statements under oath. Nonetheless, Mr. Webb's deposition testimony was detailed, believable, and was offered by Webb despite potential criminal prosecution. Even without Webb's testimony, the Trustee believes that there is substantial evidence to show that Johnson at a minimum had knowledge of the conversion of bankruptcy assets. Johnson's efforts to cover-up the coal sales by asserting that TJDB obtained coal from Calgon is almost as bad as the conversion itself. This evidence as well as Johnson's admitted act of liquidating the entirety of the base coal raises material questions of credibility that impact the viability of the Civil Action against Peoples Bank.

26.     In addition to the foregoing, the Trustee asserts that Johnson misrepresented the ownership of 750 acres of Wyoming County real estate listed on Johnson's personal bankruptcy schedules. At Johnson's 341 meeting of creditors, Johnson testified that he owned 750 acres of vacant land and that he valued the property based upon his discussions with realtors as to the value of unimproved land. The Trustee subsequently learned that the property was actually transferred by Johnson pre-petition to Appalachian Coal Enterprises, LLC, despite a first deed of trust held by Ohio Valley Bank. Johnson also testified at his meeting of creditors that Appalachian Coal Enterprises owned only an excavator. The Trustee has been informed through his discussions with permit engineer Tonya Johnson, that an exploratory permit was obtained on the property and that Johnson had attempted to sell the property to an energy company only weeks prior to the bankruptcy. The Trustee has subsequently entered into an agreement to sell the property to a coal company that is currently mining on tracts adjacent to the property.

**Allegations Against Receiver Zachary Burkons and Dismissal by District Court**

27.     In his Complaint, the Trustee alleged that while State Court appointed receiver Zachary Burkons was attempting to retrieve collateral of Peoples Bank, Mr. Burkons hit/shoved Mr. Johnson, causing Johnson to fall, resulting in an "incomplete fracture" of Johnson's arm.

28.     The Trustee also alleged that even though Burkons was appointed as Receiver by the Circuit Court of Cabell County, Burkons did not qualify as Receiver because he failed to post the fiduciary bond required by the West Virginia Code. Therefore, because Burkons had not "qualified" as Receiver, the Trustee asserted that Burkons committed bankruptcy fraud by filing the involuntary bankruptcy petitions of Redbud, Green Coal, AMR, Producer's Land, Producer's Coal, and JVD.

29.     The Trustee, by Special Counsel, further asserted that Peoples Bank and Burkons created an unlawful enterprise for the purpose of collecting debt and that the physical assault and bankruptcy fraud by Burkons along with the alleged fraudulent acts of Peoples Bank against Johnson were predicate offenses of the Racketeer Influenced and Corrupt Organizations Act. 18 U.S.C § 1961, et seq.

30.     On March 2, 2018, Dewey Webb, who was present at the time of the alleged Burkons assault, testified that Johnson faked the injury and that Johnson asked Webb to lie about witnessing the assault.  Specifically, Webb stated that immediately after the alleged assault, Johnson told Webb that Johnson "is a good actor and that he should have been in the movies" and that he was going to sue Peoples Bank and get his bill paid off. **See Deposition of Dewey Webb at page 42 and 43, Exhibit F.**

31.     After a trial, the criminal charges filed against Burkons in Kentucky State Court were dismissed. Based upon the testimony of Webb, the Trustee determined that the allegations

against Burkons should also be dismissed. The allegations against Burkons severely impacted his life and business and could have resulted in a counterclaim against the estate. Burkons' counsel agreed to a mutual release of claims. **See Exhibit K**. However, before the Trustee could seek approval of the mutual release, the District Court granted Burkons' motion to dismiss. The District Court held that based upon the Rooker-Feldman doctrine it lacked jurisdiction to review the final orders of the State Court appointing Mr. Burkons as receiver and that the Trustee should have sought relief in State Court.

32.     As a result of the District Court's dismissal of Burkons as a Defendant, Counts 3, 4, 5, and 6 of the Trustee's complaint fail.

**Allegation of Fraudulent Conveyance Against People's Bank**

33.     In the complaint, the Trustee alleged that the Bank fraudulently induced Johnson to provide the bank with additional collateral and to enter into an unfavorable forbearance agreement providing for guarantees and cross collateralization of the assets of the Plaintiffs. The complaint further alleges that Plaintiffs were insolvent or became insolvent as a result of entering into the June 30, 2015 forbearance agreement.

34.     Based upon the information obtained by the Trustee concerning the post-petition malfeasance of Johnson, the Trustee seeks to dismiss the allegations of fraudulent inducement. The Circuit Court of Cabell County has affirmed the validity of the forbearance agreement. Through that agreement, Peoples Bank provided consideration through forbearance of collection to allow Johnson to continue operating and to provide time to obtain financing or to sell the collateral. Further, because the only assets remaining for administration by the Trustee are not subject to the liens of Peoples Bank, the cost of pursuing a fraudulent conveyance action outweighs the benefits of continued litigation of this count. Peoples Bank has asserted

comingling of assets among all the Johnson entities, which leads to complex and expensive litigation. Further to prevail on a fraudulent conveyance action and bring value to the bankruptcy estates, the Trustee would have to not only avoid liens, but also the underlying debts to Peoples Bank. Peoples Bank is by far the largest creditor and would otherwise receive the majority of funds recovered.

### Allegations Against People's Insurance Agency and GAIC

35.     The Trustee alleged that Defendant Peoples Insurance Agency conspired with Peoples Bank and SMT insurer Great American Insurance Company ("GAIC"), to deny business interruption coverage to SMT after a beltline collapse. Great American Insurance seeks to dismiss the complaint on the grounds that Johnson refused to appear for an "examination under oath" as required by the business interruption policy. GAIC's motion to dismiss is pending. Further, GAIC asserts that Johnson failed to provide proof of equipment rental and additional labor expense incurred as a result of the belt-line collapse.

36.     SMT claimed that the beltline collapse resulted in additional labor and equipment rental costs of $437,000.  However, because labor and equipment were provided by other entities owned by Johnson and detailed records were not maintained under Johnson's due to / due from method of accounting, it will be difficult to prove damages without credible and trustworthy testimony.  In addition to the $100,000 previously paid by GAIC, GAIC has agreed to pay an additional $55,000 in full settlement and release of claims against GAIC. The Trustee seeks approval to compromise with GAIC and to dismiss Peoples Insurance Agency for a mutual release of claims.

37.     On June 22, 2018, the District Court dismissed Count Ten of the Trustee's complaint, bad faith, against Peoples Insurance Agency.

## RELIEF REQUESTED

38.    Through this Motion, the Trustee seeks to: 1) enter a compromise with Peoples Bank that provides for a complete mutual release of claims, a contribution to the estate from Peoples Bank to allow for the reorganization of the Dennis R. Johnson, II bankruptcy case, and resolves and allows certain claims held by Peoples Bank via a mutually agreeable plan to be filed by the Trustee and Peoples Bank; 2) enter a mutual release of claims with Peoples Insurance Agency; and 3) authorize the compromise of SMT's claim against Great American Insurance Company for the sum of $55,000.00.

39.    Subject to the approval of the Court, the Trustee and Peoples Bank have negotiated the following:

A. Civil Action.   The Civil Action against Peoples Bank shall be dismissed with prejudice and granted full and complete release from the Trustee and the estates he represents. Peoples Bank shall release all claims against the Trustee and Bankruptcy Estates for malicious prosecution, defamation and any other claims held by Peoples Bank arising from the claims asserted by the Trustee in the Civil Action. The Trustee shall release Peoples Bank from any and all claims asserted in the Civil Action or which could have been asserted by the Trustee, the Debtors or their estates.

B. Sabbatical, Inc. bankruptcy case. The Trustee and Peoples Bank shall file a co-sponsored Chapter 11 Plan that proposes the appointment of a plan administrator. The plan administrator shall be selected by and agreed to by both the Trustee and Peoples Bank.

1.    Administrative Claim of Peoples Bank. Peoples Bank shall be allowed an administrative claim in the amount of $100,000, for its efforts in identifying and recovering assets that were misappropriated.  The administrative claim of Peoples shall be paid pro-rata with other administrative claims. Peoples Bank shall waive all other administrative claims against Sabbatical.

2.    Unsecured Claim of Peoples Bank.  Peoples Bank has filed a secured claim of $19,627,402.39.  Peoples Bank has provided evidence of a direct claim of $1,007,500 ("direct claim"). Any amount asserted over the direct claim is a damage claim ("damage claim"). The direct claim and damage claim shall be treated as unsecured claims.  All administrative claims shall be paid before any payment on the direct claim or damage claim.  After payment of approved administrative expenses, the

direct claim, along with similarly classified claims of other creditors, shall be paid in full. The damage claim shall be subordinated to other allowed unsecured claims of Sabbatical. After payment of other allowed unsecured claims, Peoples Bank shall receive 80% of the net of any recoveries by the estate after costs incurred by the Plan administrator and the estate of Dennis R. Johnson, II, shall receive 20% of the net of any recoveries by the estate after costs incurred by the Plan administrator.

C. <u>Dennis R. Johnson, II bankruptcy case</u>. The Trustee and Peoples Bank shall file a co-sponsored Chapter 11 Plan that proposes the appointment of a plan administrator. The plan administrator shall be selected by and agreed to by both the Trustee and Peoples Bank.

    1. <u>Contribution for Payment of Administrative Expenses</u>. The Trustee currently holds little to no funds in the Dennis Johnson case. At confirmation, the Bank will contribute funds necessary to bring the cash balance of the estate to $250,000.00. The sum of $50,000.00 will be used as seed money to fund the Chapter 11 plan administration in both the Johnson and Sabbatical case. The remaining $200,000 shall be disbursed pro-rata at confirmation to pay allowed administrative claims. Any funds that come into the estate after confirmation will first go to repay Peoples Bank's contribution, but only to the extent of $200,000 ($50,000 of the contribution made by Peoples Bank will not be repaid to Peoples Bank and will be used as seed money for plan administration). After the payment of the Peoples Bank contribution, any funds recovered after payment of plan administration expense will go to pay remaining approved administrative expenses, then priority claims and then general unsecured claims. Except as set forth herein, Peoples Bank's claim shall be classified as general unsecured.

    2. <u>Administrative Claim of Peoples Bank</u>. People's Bank shall have an administrative claim in the amount of $55,000, which shall be subordinated to all other administrative claims, related to the substantial contribution of Peoples Bank and will help fund the costs associated with preparing the co-sponsored Chapter 11 plan. Peoples Bank agrees to draft the co-sponsored Chapter 11 plan and disclosure statement and any amendments thereto. Peoples Bank shall waive any other administrative claim.

    3. <u>Priority Tax Claim of IRS</u>. The Disclosure Statement shall list the full amount of the IRS priority claim. Peoples reserves its right to object to the claim.

D. <u>All Remaining Jointly Administered Bankruptcy Cases</u>. All remaining cases will be administered in accordance with the Bankruptcy Code and Rules of Bankruptcy Procedure. Peoples Bank and the Trustee will work in good faith to identify any other cases that would benefit from the filing of a co-sponsored plan with a plan administrator.

## LEGAL BASIS FOR RELIEF REQUESTED

40.     Bankruptcy Rule 9019 provides for the authority to settle a matter with the approval of the Court, after notice and hearing.  *See* Fed. R. Bankr. P. 9019; *See also In re Alpha Nat. Res. Inc.*, 544 B.R. 848, 856-57 (Bankr. E.D. Va. 2016) (discussing the applicable authority in the Fourth Circuit for approving settlements and compromises).

41.      Courts will only approve compromises and settlements that are fair and equitable.  *See Protective Committee for Indep. Stockholders of TMT Trailer Ferry v. Anderson*, 390 U.S. 414, 424, 88 S. Ct. 1157, 20 L. Ed. 2d 1 (1968).

42.     Four factors have been developed to help guide a court's analysis as to whether a settlement should be approved: (i) the probability of success in litigation; (ii) the potential difficulties in any collection; (iii) the complexity of the litigation and the expense, inconvenience, and delay necessarily attending it; and (iv) the paramount interest of the creditors. *In re Frye*, 216 B.R. 166, 174 (Bankr. E.D. Va. 1997) (*citing In re Martin*, 91 F.3d 389, 393 (3d. Cir. 1996)); *see also In re Three Rivers Woods, Inc.*, No. 98-38685, 2001 Bankr. LEXIS 737, 2001 WL 720620 at *5-6 (Bankr. E.D. Va. Mar. 20, 2001).

43.     The Court can approve a proposed settlement so long as it does not fall "below the lowest point in the range of reasonableness." *In re Austin*, 186 B.R. 397, 400 (Bankr. E.D. Va. 1995) (*quoting In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983)).

44.     "In essence, a compromise or settlement will [most] likely gain approval if it is both 'fair and equitable,' as well as representative of the best interests of the estate as a whole." *In re Three Rivers Woods Inc.*, 2001 Bankr. LEXIS 737, 2001 WL 720620 at *6 (citations omitted).

45.     A bankruptcy judge is not required to "conduct a full evidentiary hearing or mini trial" before approving a settlement. *Id.* (*citing DePoister v. Mary M. Holloway Found.*, 36 F.3d 582, 586 (7th Cir. 1994)).

46.     The Trustee brings the instant Motion after exercising his sound, business judgment in deciding to: 1) compromise with Peoples Bank, 2) enter into a mutual release of claims with Peoples Insurance Agency, 3) compromise SMT's claim against Great American Insurance Company for the sum of $55,000.00, and 4) enter into a mutual release of claims with Zachary Burkons, all subject to the approval by this Court.

47.     Upon due consideration of each of the factors, the Trustee believes that it is in the best interest of the creditors and the estates to approve the Dismissal and Compromise.

48.     With respect to the first factor, it is apparent to the Trustee that the Trustee is unlikely to prevail on its claims against Defendants, except for recovering some value on SMT's claims for business interruption. The misrepresentations made by Johnson to the Trustee, U.S. Trustee, and the Court prevent the Trustee from accepting any statement by Johnson as true and credible. The Trustee recognizes that Johnson made many representations to Defendants and their agents leading to the events which gave rise to the allegations in the Complaint. The theories advanced in the complaint are complex and require trust and credibility of the Debtors to advance.

49.     The second factor – relating to the difficulties in collections – is in applicable to the Trustee's motion, since the remaining defendants, upon information and belief, could pay the amount demanded in the Complaint.

50.     The third factor relates to the complexity of the litigation and the expense, inconvenience, and delay necessarily attending it. The litigation against Defendants is complex

and has become nearly impossible to advance because of credibility issues of Johnson. The Trustee is unable professionally and ethically to advance an action in which he has no confidence. Administrative claims filed are large and create the risk of administrative insolvency. The compromise with Peoples Bank, if approved, will fund a plan of liquidation and eliminate ongoing claims litigation with Peoples Bank in both the Dennis R. Johnson, II bankruptcy case and the Sabbatical, Inc. bankruptcy case.

51. Finally, approving the compromise and dismissal is in the best interest of the creditors and the estates because it guarantees payment of $55,000 to SMT and its creditors and relieves the estate from burdensome and expensive litigation. The compromise will also fund a plan of liquidation in the Dennis R. Johnson, II and Sabbatical bankruptcy estates and eliminate costly claim litigation and allow a plan administrator to focus on recovering assets for the benefit of creditors.

52. The Trustee respectfully requests that this Honorable Court approve the compromise in its entirety. Upon approval of this Court, appropriate pleadings will be filed with the United States District Court.

WHEREFORE, the Trustee respectfully requests that this Honorable Court enter an appropriate order authorizing the dismissal and compromise of the Civil Action.

Thomas H. Fluharty, Chapter 11 Trustee
By Counsel,

/s/ Joe M. Supple
Supple Law Office PLLC
801 Viand Street
Point Pleasant, WV 25550
304.675.6249
joe.supple@supplelaw.net

## <u>CERTIFICATE OF SERVICE</u>

       I, Joe M. Supple, certify that a true copy of the foregoing TRUSTEE'S MOTION FOR AUTHORITY TO COMPROMISE PENDING CIVIL ACTION AGAINST PEOPLES BANK, PEOPLES INSURANCE AGENCY, LLC, GREAT AMERICAN INSURANCE COMPNAY OF NEW YORK, AND ZACHARY B. BURKONS was served by this Court's CM/ECF system on July 3, 2018 to all parties having registered in this case under the Court's CM/ECF system.

<u>/s/ Joe M. Supple</u>
Supple Law Office PLLC
801 Viand Street
Point Pleasant, WV 25550
304.675.6249
joe.supple@supplelaw.net