*Frank W. Volk*

Frank W. Volk, Chief Judge
United States Bankruptcy Court
Southern District of West Virginia

**Dated: March 31st, 2019**

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF WEST VIRGINIA
## IN HUNTINGTON

| | |
|---|---|
| IN RE: | CASE NO. 3:16-bk-30227<br>*Joint Administration* |
| DENNIS RAY JOHNSON, II, APPALACHIAN MINING AND RECLAMATION, L.L.C., DJWV1, LLC, DJWV2, LLC, ELKVIEW RECLAMATION & PROCESSING LLC, GREEN COAL, LLC, JOINT VENTURE DEVELOPMENT, LLC, THE LITTLE KENTUCKY ELK, LLC, MOUSSIE PROCESSING, LLC, PRODUCER'S COAL, INC., PRODUCER'S LAND, LLC, REDBUD DOCK, LLC, SOUTHERN MARINE SERVICES LIMITED LIABILITY COMPANY, SOUTHERN MARINE TERMINAL, LLC, and SABBATICAL, INC., | CHAPTER 11<br>JUDGE FRANK W. VOLK |
| Debtors | |

## MEMORANDUM OPINION AND ORDER

Pending are the following matters: (1) Application for Administrative Expenses by Patrick S. Cassidy, Thomas M. Cunninghamn, and Martin P. Sheehan (the "Application") [dckt. 1037]; (2) Motion to Compromise or Approve Settlement filed by Trustee Thomas H. Fluharty (the "Fluharty Motion to Compromise") [dckt. 1212]; (3) Motion filed by Denise Johnson to Treat Trustee's Motion to Compromise as a Sale Motion Under 11 U.S.C. § 363 (the "Motion to Treat as Sale") [dckt. 1239]; (4) the Upset Bid filed by Denise Johnson (the "Upset Bid") [dckt. 1240];

and (5) Application for Interim Compensation filed by Lewis Glasser (the "LG Application") [dckt. 1237].

These matters came before the Court for hearing on November 20 and December 10, 2018. Following argument, the Court instructed the parties to file supplemental briefing. The deadline for objections to the LG Application was December 24, 2018, with Responses due by December 31, 2018. All parties who presented evidence at the December 21, 2018, hearing were to submit a joint stipulation of facts, along with post-hearing briefs and cross-responses, with the last deadline being January 23, 2019. The Joint Stipulation was filed on January 15, 2019, and all briefing deadlines have elapsed. The matter is ready for adjudication.

## I.

### A.      Procedural Background

In May 2016, a number of related entities controlled by Dennis Johnson filed Chapter 11 bankruptcy petitions. Along with Mr. Johnson, individually, the filing entities are: Appalachian Mining and Reclamation, LLC, DJWV1, LLC, DJWV2, LLC, Elkview Reclamation and Processing, LLC, Green Coal, LLC, Joint Venture Development, LLC, Little Kentucky Elk, LLC, Moussie Processing, LLC, Producer's Coal, Inc., Producers Land, LLC, Redbud Dock, LLC, Southern Marine Services, LLC, Southern Marine Terminal, LLC, and Sabbatical, Inc. (excluding Joint Venture Development, LLC, the "Coal Enterprise"). All of the debtor entities, except for Joint Venture Development, LLC, were part of the Coal Enterprise controlled by Dennis Johnson. The Court ordered that the cases be jointly administered under the Dennis Johnson case (3:16-bk-30227) and appointed a Chapter 11 Trustee on November 7, 2016. Sabbatical, Inc. ("Sabbatical") was joined with the Coal Enterprise cases on March 24, 2017.

2

B.      **Factual Background**

Between September 23, 2011, and April 23, 2013, Peoples Bank ("Peoples" or "Bank") made several loans to multiple debtor entities, one of which was guaranteed by Dennis Johnson and Mark Pinson.  On June 30, 2015, Mr. Johnson and Peoples executed a forbearance agreement ("the Forbearance Agreement").   In the Forbearance Agreement, Mr. Johnson, on behalf of himself and other entities, pledged additional collateral for the Peoples' loans.  Pursuant to the Forbearance Agreement, all of Mr. Johnson's assets identified therein had to be refinanced or sold by the end of 2015.  Sabbatical was not a party to the Forbearance Agreement.

Just prior to the execution of the Forbearance Agreement, Peoples ordered appraisals of several Coal Enterprise assets, namely, the Ivel Wash Plant, the Logan Mine, and the Stonecoal Mine.  Peoples received the preliminary appraisal on the Stonecoal Mine on April 16, 2015, and shared it with Mr. Johnson that day.  Peoples obtained the final appraisals on June 19, 2015, which also included valuations of the Logan Mine and Ivel Wash Plant (the "Final Appraisals").  The Final Appraisals indicated that the combined conditional value of the three properties could reach as much as $69,000,000.  The Final Appraisals were effective July 1, 2015.

During negotiations on the Forbearance Agreement, and before receiving copies of the Final Appraisals, Mr. Johnson emailed Peoples and threatened to declare bankruptcy should the Bank not offer him the terms he sought to be included in the draft Forbearance Agreement.  Mr. Johnson, having pledged collateral for an anticipated Forbearance Agreement, was unaware of the aforementioned Final Appraisals and threatened to void the pledge of additional collateral through a bankruptcy filing if the desired Forbearance Agreement was not forthcoming. As noted, the Forbearance Agreement was eventually executed by the parties on June 30, 2015.  Mr. Johnson, however, did not receive the Final Appraisals until July 2, 2015.  When he asked Peoples about

3

the Final Appraisals prior to receiving them, the Bank allegedly misrepresented to him the valuations appearing therein.

After reviewing the Final Appraisals, Mr. Johnson signed an amendment to the Forbearance Agreement in August 2015 (the "Forbearance Amendment"). The Forbearance Amendment was signed by Mr. Johnson and lists Joint Venture Energy Associates, LLC, as an obligor ("Joint Venture Energy"). Joint Venture Energy was not an obligor on the original Forbearance Agreement. The Forbearance Amendment was not signed by Peoples, nor was it signed by any of the obligors on the original Forbearance Agreement.

After Peoples declared a default under the Forbearance Agreement and initiated state court litigation[1] against Mr. Johnson and several Coal Enterprise entities, the bankruptcy cases were filed on May 9, 2016. The Chapter 11 Trustee, Thomas Fluharty, was appointed thereafter. Almost immediately, the Trustee sought to sell the Coal Enterprise assets inasmuch as virtually no cash remained on hand and potentially disastrous environmental issues loomed large.

While the Trustee was in the process of soliciting interested buyers, he and Peoples initiated an adversary proceeding against Dewey Webb (the Dock Manager for the Lockwood Dock, owned by Sabbatical) and TJD&B, LLC (a company formed by Mr. Webb). The Trustee alleged that the defendants conspired with Mr. Johnson and converted assets of the Coal Enterprise estates by excavating and selling the coal base at the Lockwood Dock to Noble Americas Corp. Payment for the coal was remitted to TJD&B, LLC. According to Peoples' deposition of Mr. Webb, he acted at Mr. Johnson's direction. Mr. Fluharty further alleged that Mr. Johnson attempted to cover up the theft by claiming the sold coal was purchased from a company named

---

[1] As part of this litigation, Receiver Zachary Burkons was appointed by the Circuit Court of Cabell County.

4

Calgon.  Peoples asserts that Mr. Webb was pressured to sign a false affidavit and record fake phone calls to obfuscate Mr. Johnson's involvement in the scheme.  At a hearing on March 1, 2019, the parties in the Webb adversary proceeding announced a compromise that awaits court review and approval.

Meanwhile, the Chapter 11 Trustee closed on the sale of Coal Enterprise assets in October 2017.  In addition to payment, the buyer, Stella Natural Resources ("Stella"), assumed liability of the environmental permits to the tune of $1.6 million.  From the sale proceeds, $2.6 million was distributed to Peoples, $200,000 went to Community Trust Bank, and $800,000 was paid to Prater Creek.  Peoples agreed to carve out from its secured claim $450,000 to pay the Trustee's sale costs.  A significant percentage of that carve-out was used by the Trustee to fund mining permit maintenance expenses.  In the sale order, the Trustee reserved the right to seek recovery of funds paid to Peoples in case the Forbearance Agreement was ever adjudicated to be fraudulently induced.

Of the funds paid by the Trustee to Peoples pursuant to the sale, portions were based on a resolution between the two regarding the value of the assets and the bankruptcy claims Peoples asserted, as well as the sale of assets held by Producers Land WV, LLC, which is not a debtor in the Coal Enterprise.  According to the underlying sale motion, the distribution of sale proceeds did not qualify as a release of claims.

Subsequently, the Trustee decided to investigate actions against Peoples and several other defendants on behalf of the Coal Enterprise estates.  In May 2017, he employed for that purpose Patrick Cassidy of Cassidy, Cogan, Shapell & Voegelin, L.C., and Martin Sheehan of Sheehan & Nugent PLLC (collectively "Special Counsel").  In October 2017, Special Counsel instituted a civil action on behalf of the Trustee and several Coal Enterprise entities in the Southern

District of West Virginia ("District Court Action") against Peoples, Peoples Insurance Agency LLC ("Peoples Insurance"), Great American Insurance Company of New York ("GAIC"), and Zachary B. Burkons.

The District Court Action centers on various loans from Peoples to the affected Coal Enterprise entities through loan officer Robert Van Nostrand from 2011 to 2014.  The loans total approximately $19,000,000.  The Coal Enterprise entities assert that Mr. Van Nostrand and Mr. Johnson enjoyed a confidential and special relationship which was exploited by Peoples.  The case involves key appraisals that may have been withheld from Mr. Johnson, representations by Mr. Van Nostrand regarding long-term refinancing offers from Peoples to Mr. Johnson,[2] and potential fraudulent inducement by Peoples which caused Mr. Johnson to offer additional collateral on the loans and enter into what he believes was an "unfavorable" Forbearance Agreement.

The Coal Enterprise entities claim that Peoples did not follow through with Mr. Van Nostrand's promises of refinancing and thus required Mr. Johnson to pursue an asset sale, under Peoples' supervision and control, which Peoples' Board of Directors later rejected.  Peoples also allegedly offset against insurance monies due to the Coal Enterprise entities and acted negligently in the later-instituted state receivership actions mentioned earlier.  Consequently, the Coal Enterprise entities assert that Mr. Johnson "lost" the entirety of his coal operations and assert damages equal to the value of the Coal Enterprise as established by the Final Appraisals.   Additionally, the Plaintiffs seek punitive damages for breach of fiduciary duty, fraudulent inducement, fraudulent conveyance, tortious interference, unlawful setoff, contempt, negligence,

---

[2] After Mr. Johnson allegedly defaulted on the loans, Peoples sought additional collateral. Allegedly, Mr. Van Nostrand represented to Mr. Johnson that, if he pledged additional collateral, and the Coal Enterprise appraisals returned with favorable numbers, Peoples would extend a new ten-year loan.

and RICO violations.  Importantly, the District Court Action complaint also alleges that Mr. Johnson and his companies were insolvent or became insolvent as a *result* of entering into the Forbearance Agreement.

The case against Peoples Insurance is based on contentions that it conspired with Peoples and GAIC (which insured *only* Southern Marine Terminal, LLC ("SMT")) to deny business interruption coverage to SMT after a beltline collapse at the Ivel Wash Plant in May 2015. GAIC investigated the insurance claim and paid SMT over $1.2 million to rebuild the conveyer belt. SMT never rebuilt the belt, however, and the vast majority of the insurance funds were distributed elsewhere. Mr. Johnson submitted a business interruption claim to GAIC in November 2015. GAIC did pay $100,000 pursuant to SMT's business interruption coverage. GAIC's defenses to the business interruption allegations include Mr. Johnson's failure to appear for an "examination under oath," which was required by the business interruption policy, and his failure to provide proof of equipment rental and additional labor expense incurred as a result of the collapse. Count Ten of the District Court Action complaint against Peoples Insurance, which sounded in bad faith, was dismissed by the District Court on June 22, 2018.

The allegations against Zachary Burkons stem from his appointment as state court Receiver. Mr. Burkons was attempting to retrieve collateral of Peoples when he became involved in a physical altercation with Mr. Johnson. Mr. Burkons allegedly shoved Mr. Johnson, who fell and claims to have suffered an "incomplete" arm fracture. The Coal Enterprise entities allege that Mr. Burkons should not have qualified as a Receiver in the first place due to fiduciary bond requirements, which resulted in bankruptcy fraud when he filed involuntary petitions for several of the Coal Enterprise debtors. Finally, the District Court Action complaint asserts that Peoples

and Mr. Burkons together created an unlawful RICO enterprise.  Mr. Burkons was dismissed by the District Court on April 24, 2018, but certain appeal rights remain.

During the pendency of the District Court Action, Special Counsel and Mr. Fluharty developed differing opinions of the case. Mr. Fluharty essentially lost confidence in some of the factual allegations contained in the complaint, a serious matter in light of Federal Rule of Civil Procedure 11(b)(3).  Specifically at issue was the question of whether Mr. Johnson was insolvent at certain points in 2015 given the outcome of Peoples' Final Appraisals. In view of this development, Special Counsel, following a professed study of the governing ethical provisions, felt obliged to withdraw from representation of the Trustee on March 9, 2018.

Following withdrawal, Special Counsel filed the instant Application seeking $626,181.94 in fees and costs as an administrative expense in the Coal Enterprise cases.  Mr. Cassidy and his colleague, Mr. Cunningham, assert they devoted in excess of 800 hours over 15 months of representation, which accounts for approximately 40% of their attorney time over those months.  The difficulty, however, is that the billing entries are not contemporaneous. They are a reconstruction inasmuch as Special Counsel pursued the District Court Action on a contingency basis.  Special Counsel's work involved review of over 9,500 pages of documents, along with a mediation in September 2017.  Objections to the Application were lodged by Mr. Fluharty, Peoples, and Dennis Jonson.

Meanwhile, in the Coal Enterprise bankruptcy cases,  Mr. Fluharty initiated an adversary proceeding in April 2018 with a complaint against Melissa Eakle Leasure (Trustee of the Dennis R. Johnson, II Children's Trust), Denise Dawn Johnson (Trustee of the Denise Johnson Real Estate and the Dennis R. Johnson, II Children's Trusts), and Denise Johnson individually. Mr. Fluharty principally alleged that Dennis Johnson made fraudulent transfers of real estate and

his controlling interest in Sabbatical to these Trusts in March 2015.  In response, Mr. Johnson asserted that the transfers were in good faith, with no intent to defraud creditors, and that he was solvent when the transfers were made.

Subsequently, in the Coal Enterprise bankruptcy cases, Mr. Fluharty also filed an adversary proceeding against Noble Americas Corp. and other defendants for damages stemming from the defendants' below-market price purchases of coal prior to Sabbatical's bankruptcy filing. Additionally, Mr. Fluharty asserted that the defendants participated in the unauthorized sale of Sabbatical's coal after its bankruptcy filing.  Actual damages in excess of $1 million are sought, along with punitive damages, costs, and attorney fees.

On July 3, 2018, Mr. Fluharty filed a Motion for Authority to Compromise and Dismiss Pending Civil Action, attempting to resolve the District Court Action by: (1) dismissing Peoples; (2) entering into a mutual release of claims with Peoples Insurance Agency; and (3) compromising Southern Marine Terminal LLC's claim against Great American Insurance Company of New York for $55,000 (the "First Compromise Motion").   Dennis Johnson, McCormick 101, LLC, and Denise Johnson objected.

Around the same time in the District Court Action, Mr. Fluharty's insurance bad faith claim against Peoples Insurance was dismissed, and the District Court denied GAIC's motion to dismiss the complaint.

In response to the First Compromise Motion, on August 3, 2018, Dennis Johnson filed a Motion to Treat Compromise as a Sale Motion, along with an Upset Bid.  According to those filings, Mr. Johnson proposed that he would substitute himself as Plaintiff in the District Court Action by way of an assignment, Special Counsel would return to prosecute the matter and

withdraw the Application, and the Coal Enterprise Estate would receive 50% of any net recovery in the case.

On September 17, 2018, the District Court entered a Memorandum Opinion and Order dismissing three of Mr. Fluharty's claims (bad faith, contempt, and punitive damages) but also denying Peoples' Motion to Dismiss the remaining thirteen counts.

Mr. Fluharty thereafter withdrew his First Compromise Motion and filed the instant Fluharty Motion to Compromise.  There are several components to the Fluharty Motion to Compromise. First, it provides for a mutual release among the parties and dismissal of the District Court Action, along with a compromise of the Application filed by Special Counsel reducing their administrative claim from $626,000 to $271,000.  That fee payment would come from two sources: $250,000 from Peoples and $21,000 from Mr. Fluharty's carve-out in the Coal Enterprise asset sale.  Second, Peoples will reduce its unsecured claim in all of the jointly administered cases (and in the Silo Golf Course case) from $19 million to $12 million.  This will necessarily involve settlement of Peoples' $19.6 million proof of claim in the Sabbatical case.  Third, a portion of Peoples' proof of claim in the Sabbatical case for $1,007,500 will be deemed a "direct claim," and any amount asserted over that will be deemed a "damage claim" and subject to the $12 million cap.  Both the direct and damage claims will be treated as unsecured claims and will be paid after all the administrative claims are satisfied; the damage claim will be subordinated to the other unsecured claims in the Sabbatical case.  Fourth, after payment of the other unsecured claims, Peoples will receive 80% of the net recoveries by the Sabbatical estate and the Dennis Johnson estate shall receive 20%.

Fifth, Peoples also has an administrative claim in the Sabbatical case which will be settled under the Fluharty Motion to Compromise.  Peoples will receive an administrative claim in

10

the amount of $100,000, representing efforts made by the Bank to identify and recover misappropriated coal assets. This claim will be paid *pro rata* with the other Sabbatical administrative claims. Finally, the Fluharty Motion to Compromise requires a good faith effort by Peoples and Mr. Fluharty to propose a single Chapter 11 Plan in the Sabbatical and Dennis Johnson cases. The compromise is not conditional on confirmation but, if confirmed, the Plan will include a cash distribution from Peoples to the Dennis Johnson Estate in the amount of $250,000 to pay administrative expenses and provide seed money for a plan administrator. Of that cash contribution, $200,000 will be repaid to Peoples as assets are collected. Additionally, the Plan will propose a subordinated administrative claim of $55,000 held by Peoples.

In response, Denise Johnson filed her Motion to Treat Compromise as a Sale Motion and her Upset Bid to the Settlement Agreement. Mrs. Johnson is technically a creditor and an interested party in this matter, as she filed one proof of claim in the Little Kentucky Elk case.[3] Mrs. Johnson is offering the following: (1) assignment of herself or another designee as Plaintiff in the District Court Action; (2) immediate payment of $100,000 to the Coal Enterprise estates; (3) Mrs. Johnson's agreement to return to the Estates both the first $5,000,000 of any net recovery from the District Court Action and 75% of any further net recovery; (4) employment of Rich Weston as Plaintiff's counsel at a 50% contingency fee (of which 5%, or up to $600,000, would be available to pay the administrative fee claim of Special Counsel); and (5) withdrawal of Lewis Glasser PLLC's Application for Administrative Expenses (an amount of $146,083). Importantly, Mrs. Johnson proposes this putative Upset Bid without agreement of Special Counsel.

---

[3] The Court notes that this claim was filed on February 28, 2017, well before the Trustee initiated the District Court Action.

As of October 2018, there are approximately $400,000 in administrative claims asserted by professionals in the Dennis Johnson bankruptcy case.  And the Internal Revenue Service is asserting a proof of claim in the Dennis Johnson case in excess of $480,000.

## C.    Testimony from the November 20 and December 10, 2018, Evidentiary Hearings

### 1.    Patrick Cassidy

As noted, Mr. Cassidy and Mr. Sheehan served as Special Counsel to the Trustee in prosecuting the District Court Action.  The engagement letter spoke only of a contingency fee.

Respecting Special Counsel's withdrawal in the District Court Action, Mr. Cassidy said, "[i]t was our choice."  [Dckt. 1308, p. 17].  He further testified that "the trustee . . . did not believe in the allegations . . . of the complaint," and that led to "potential conflicts of interest for [Special Counsel] . . . ." [Dckt. 1308, p. 7].  The crux of the disagreement revolved around whether Mr. Johnson was insolvent at the time he made several conveyances of property.   Mr. Fluharty was, at the time, prosecuting a fraudulent conveyance action in the bankruptcy court which rested upon the theory that Mr. Johnson had been insolvent during the transfers in question.  In contrast, Special Counsel began to believe that Mr. Johnson's estate was worth "substantial money."  [Dckt. 1308, p. 7].  During cross-examination, Mr. Cassidy elaborated, explaining that his valuation of the Coal Enterprise estates stemmed from the Final Appraisals performed by Peoples and the Forbearance Agreement signed by Mr. Johnson.  Mr. Cassidy considered his cessation of services to Mr. Fluharty a "constructive discharge."  [Dckt. 1308, p. 7].

Because Special Counsel had been retained on a contingency basis, Mr. Cassidy testified, he, Mr. Cunningham (his associate), and Mr. Sheehan had not kept contemporaneous time records.  In order to file the Application, Mr. Cassidy explained that he and Mr. Cunningham

reconstructed their time.  This involved "print[ing] out all the e-mails that were sent for that year," "look[ing] at all the documents that [they] reviewed during that year," "looking at all the pleadings that had been prepared," and arriving at their "best estimate on the actual time that would have been expended" by them [Dckt. 1308, pp. 8-9].   Mr. Cassidy noted that he had performed such reconstructions before and had presented them to "various state courts," and perhaps the "[N]orthern [D]istrict federal court."  [Dckt. 1308, p. 8].

Mr. Cassidy was retained specifically as chief litigation counsel and brought Mr. Sheehan into the arrangement because of his experience in bankruptcy, explaining that, "[w]e are not bankruptcy lawyers, never have been."  [Dckt. 1308, p. 9].  Mr. Cassidy generally "look[ed] at everything and overview[ed] everything."  [Dckt. 1308, p. 9].  Mr. Sheehan was responsible for "analyzing all the issues with respect to bankruptcy and also some unique issues of criminal law . . . ."  [Dckt. 1308, p. 10].  Generally, they "all collaborated."  [Dckt. 1308, p. 10].  Mr. Cassidy did not perform an apportionment of his fees between the jointly administered bankruptcy cases.

In describing some of the work they had done, Mr. Cassidy referred to a mediation with Peoples where "big numbers were tossed around before and after," and also to the "very extensive complaint" he drafted that initiated the District Court Action.  [Dckt. 1308, pp. 10-11].  Mr. Cassidy additionally noted that Special Counsel had prepared a confidential mediation statement which he felt would demonstrate the value of the services he rendered.  He described it as "a story of, you know, the claim.  It's the basis for the claim."  [Dckt. 1308, p. 20].  On cross-examination he elaborated, explaining that prior to the mediation Special Counsel had denied requests for informal mediation and thus never met with Peoples, nor did Mr. Cassidy request any documents from the Peoples.  Mr. Cassidy felt they were very prepared prior to filing, more so

than in any other case.  Thus, he felt that his hourly estimates and request for compensation were reasonable, submitted in good faith, and conservative.

At the time Special Counsel filed the Application, no funds had been recovered from any defendants in the District Court Action.  Mr. Cassidy testified that he feels Special Counsel is entitled to payment as a matter of law on a *quantum meruit* basis inasmuch as withdrawal was required by the circumstances and Special Counsel was constructively terminated.

With respect to the Upset Bid, Mr. Cassidy stated that Special Counsel would be willing to resume their representation in the District Court Action should Mrs. Johnson be substituted as Plaintiff.  He explained that he had been willing to do so in Dennis Johnson's putative Upset Bid following Mr. Fluharty's First Motion to Compromise.  Under that scenario, Special Counsel would have withdrawn the Application and sought recovery in the District Court Action alone instead of from the Coal Enterprise entities.  Mr. Cassidy agreed that he still thought the District Court Action had sufficient value to justify withdrawal of the Application. He surmised that the lawsuit was worth at least double his contingency fee.

### 2.    Martin Sheehan

Mr. Sheehan explained the divided responsibilities of Special Counsel. He noted that his hours were modest compared with those billed by Messrs. Cassidy and  Cunningham inasmuch as Mr. Cunningham took responsibility for reviewing documents and Mr. Sheehan focused on "some issues that [he] thought were peculiarly bankruptcy issues . . . ," along with receivership issues on which he "spent some time focusing on those facts and developing legal theories."  [Dckt. 1308, p. 25].  As a former Assistant United States Attorney, he also focused on RICO issues and explored related potential causes of action.  Mr. Sheehan specified that he spent

time reading about Receiverships, interviewing people, and researching while drafting the District

Court Action complaint.   He testified that Mr. Cunningham spent "hours and hours" on the

litigation, while he spent "a couple of hours a day without fail" at Mr. Cassidy's office working

on the cases.   [Dckt. 1308, pp. 27-28].   The attorneys conferenced, "talked theories," and Mr.

Sheehan routinely traveled to Clarksburg for case-related purposes.   [Dckt. 1308, p. 27].   Mr.

Sheehan reiterated that Special Counsel had not met with Peoples prior to formal mediation, and

the parties did not come into contact during that meditation.

   Like Mr. Cassidy, Mr. Sheehan did not keep contemporaneous time records.   In

reconstructing his hours for the Application, he generally looked at the documents he prepared

(including time information available about the document from WordPerfect) and reviewed

emails.   [Dckt. 1308, p. 26].   He also endeavored to be conservative and testified that he believed

he "ha[d] a very solid basis for the time [he] submitted" and gave "the benefit of the doubt to Mr.

Fluharty."   [Dckt. 1308, p. 26].   He similarly explained that he and the other attorneys had not

apportioned their fees between the different Coal Enterprise estates, in part, as "there was some

jumbling of Mr. Johnson's arrangements pre-bankruptcy and so there was some difficulty in

sorting out who might be the specific beneficiary of one or the other claims." [Dckt. 1308, p. 29].

   When asked what evidence existed to demonstrate the value of Special Counsel's

services, Mr. Sheehan listed (1) the filed District Court Action, (2) that the subject complaint

partially withstood Rule 12(b)(6) motions, and (3) the securing of dismissal with appeal rights

respecting Mr. Burkons.   Mr. Sheehan concurred with Mr. Cassidy that (1) withdrawal was

necessary, and (2) that there was enough value in the District Court Action to justify Special

Counsel withdrawing the Application, resuming representation, and pursuing a purely contingency

fee.

### 3.      Mr. Fluharty

Mr. Fluharty has served as a bankruptcy trustee for over 33 years.  He was appointed Chapter 11 Trustee of the Coal Enterprise bankruptcies in November 2016.  At that time he described the cases as "a real mess."  [Dckt. 1308, p. 37].  That is an apt characterization. *See In re Sabbatical, Inc.*, No. 3:16–bk–30247, 2017 WL 1157120, at *8 (Bankr. S. D. W. Va. Mar. 24, 2017) ("Mr. Johnson claims to have been operating under the errant assumption that the coal enterprise was not underwater. But Mr. Johnson also testified that he knew he was 'getting killed' at the other docks and that his other coal enterprise companies were struggling, and he sent an email to Mr. Pinson in January of 2015 saying that he knew that he had 'creditors closing in on him.'") (citation and footnote omitted).  Mr. Fluharty employed Joseph Supple as counsel and also retained Tonya Johnson to assist him inasmuch as she had previously worked in an engineering capacity for the Coal Enterprise.

Early in the case, Mr. Fluharty focused on maximizing liquidation value, preserving physical assets, and dealing immediately with "potentially huge environmental problems."  [Doc. 1308, p. 37-38].  Eventually, Mr. Fluharty found a buyer, Stella Natural Resources, for some of the Coal Enterprise assets. He successfully sold the Coal Enterprise properties (except for Sabbatical) for several million dollars and the assumption of environmental liabilities.  When asked on cross examination about the Stella sale, Mr. Fluharty acknowledged that Stella's offer appeared consistent with the Final Appraisals. He did not know, however, whether Stella based its sale offer on the Final Appraisals.

Mr. Fluharty discussed his relationship with Mr. Johnson at length.   At the beginning of his tenure as Trustee, he spent a "fair amount" of time with Mr. Dennis Johnson or "a few days in total."  [Dckt. 1308, p. 36].  During the Coal Enterprise asset sale process, Mr.

Fluharty felt that Mr. Johnson provided little assistance and tried to induce Mr. Fluharty to ignore or "walk away" from assets, which would have led to a "horrible catastrophe." [Dckt. 1308, p. 40]. When asked if Mr. Johnson obstructed his efforts to sell the Coal Enterprise assets Mr. Fluharty responded affirmatively. [Dckt. 1308, p. 65]. Mr. Fluharty also expressed misgivings with Mr. Johnson's truthfulness during the later sale of several permits held by Moussie Processing, LLC.

Mr. Fluharty developed "serious concerns about the credibility of Dennis Johnson" while Special Counsel was preparing to file the District Court Action, and his view of the case has since changed "dramatically." [Dckt. 1308, pp. 46, 63]. The concerns led him to consider a delay in filing. A statute of limitations concern ultimately overrode those apprehensions. Once the District Court Action was filed, and investigations continued deeper into the case, Mr. Fluharty's fears "concerning Mr. Johnson's credibility increased." [Dckt. 1308, p. 47]. Specifically, Mr. Fluharty noted emails concerning the Forbearance Agreement between Peoples and Mr. Johnson. Mr. Johnson claimed that Peoples enticed him through fraud into signing the Forbearance Agreement and that he would not have signed had he known the values appearing in the Final Appraisals.

In contrast, Mr. Fluharty read emails that instead indicated Mr. Johnson was "demanding the [F]orbearance [A]greement[] . . . be prepared." [Dckt. 1308, p. 51]. Thus, Mr. Fluharty "didn't put much stock in [Mr. Johnson's] . . . assertion that the [F]orbearance [A]greement had any meaningful effect upon his ability to refinance or get capital." [Dckt. 1308, p. 51]. Ultimately, Mr. Fluharty did not believe that Peoples pressured Mr. Johnson into signing the Forbearance Agreement. Mr. Fluharty also harbored concerns about the circumstances surrounding the belt collapse at the Ivel Wash Plant. In sum, he observed that Mr. Johnson did not

comply with insurance contract requirements and used the insurance proceeds for unrelated purposes.[4]   Moreover, Mr. Johnson did not submit a sworn proof of loss to Great American Insurance and Mr. Fluharty noted his "general inability to provide some documents." [Dckt. 1362, p. 64].   This caused Mr. Fluharty to conclude that some of the insurance claims in the District Court Action were not viable.

Respecting the claims against Mr. Burkons, Mr. Fluharty questioned Mr. Johnson's assertion that his arm had been broken during their altercation inasmuch as the medical report was inconclusive and showed, at best, a hairline fracture. Mr. Fluharty also recalled that Dewey Webb mentioned Mr. Johnson had referred to himself as "a good actor" who could convince others that "the injury had actually occurred." [Dckt. 1308, p. 54].   Furthermore, the criminal action instituted against Mr. Burkons was dismissed.   These events justifiably led Mr. Fluharty to conclude that Mr. Johnson was "scamming the system . . . ." [Dckt. 1308, p. 55].

Mr. Fluharty also detected deceit involving real estate in Wyoming.   Mr. Johnson explained to Mr. Fluharty that the land was simply family farm and hunting land.   In actuality, there was commercial interest in the property as an individual who owned an adjacent parcel was operating a coal mine and interested in acquiring the Johnson land for the same purpose.   Mr. Fluharty concluded that Mr. Johnson "misled" him. Mr. Fluharty testified that Special Counsel's withdrawal was ultimately prompted by him posing this question: "[W]hat if a jury would not believe anything that Dennis Johnson said  . . . . What is there that we could prevail upon?" [Dckt. 1308, p. 47].

---

[4]      Mr. Fluharty testified that he believed the insurance funds were used to pay attorney's fees and "those types of costs." [Dckt. 1362, pp. 58-59].

A measure of Mr. Fluharty's uneasiness concerning Mr. Johnson's candor stemmed from information again conveyed by Mr. Webb.  Mr. Fluharty forthrightly discussed Mr. Webb's credibility, explaining that although Mr. Webb told "a couple inconsistent stories," he had been "fairly consistent" since retaining counsel, had assisted in uncovering information in the TJD&B adversary proceeding, and had potentially met with both the United States Attorney and the Federal Bureau of Investigation.  When confronted with telephone transcripts between Mr. Webb and Mr. Johnson indicating Mr. Johnson's non-participation in the TJD&B coal sale scheme on cross-examination, Mr. Fluharty testified that he had listened to one of them and felt it "sounded contrived."  [Dckt. 1362, p. 78].

Other issues involved in pursuing the District Court Action arose because Zachary Burkons was dismissed.  Notably, the RICO counts depended heavily on interactions between Mr. Burkons and Peoples.  Mr. Fluharty thus believed the dismissal of Burkons substantially weakened the federal claims.

The District Court Action demands $70 million in damages. Mr. Fluharty explained that demand was arrived at using the Final Appraisals.  He testified, however, that there were problems with that valuation.  For example, the Stone Coal Mine, which was appraised at a multi-million dollar amount, was worthless inasmuch as the miners hit a rock wall and the mine interior was deluged when he was appointed Trustee.[5]  Additionally, the Logan mine had fallen victim to electrical theft.  In sum, other than the Little Kentucky Elk mine, none of the operations were

---

[5] Mr. Fluharty candidly acknowledged on cross-examination that any coal reserves *accessible* at the Stonecoal Mine would indeed retain their value notwithstanding the rock wall. He further discussed the matter, agreeing on cross-examination that there would be value in approximately 7.5 million tons of coal in surface reserves at the Stonecoal mine, but also noted that he did not believe there was an actual surface mine at that location.

working coal when Mr. Fluharty assumed control and were consequently not meeting covenant requirements respecting the quality of the coal produced.

Other concerns were apparent according to Mr. Fluharty's testimony. A few examples suffice. First, the Stonecoal lease was obviously in default, along with other leases, when the Final Appraisals were prepared. Some of the lessors asserted that the estates had forfeited on the leases and some were actually cancelled in 2016. Second, the Coal Enterprise entities were also noncompliant on their permits. Third, the Ivel Wash Plant was never taken as collateral by Peoples and thus never should have been included in the damage calculation. All three of the properties evaluated in the Final Appraisals were sold in the Coal Enterprise asset sale so, instead of basing damages on the Final Appraisals, it would perhaps have been more prudent to use the sale values of those assets.

Mr. Fluharty thoroughly discussed the Fluharty Motion to Compromise and asserted that his settlement proposal would increase the unsecured payout from roughly 22% to around 50%, although he candidly admitted that was "a little speculative." [Dckt. 1308, p. 58]. He made that characterization inasmuch as it would depend, in part, on a recovery in the fraudulent conveyance proceedings and the suit against Noble. Without funds from those cases, the current distribution under the Fluharty Motion to Compromise would not pay any secured or unsecured creditors. But in Mr. Fluharty's considered opinion, he believes the settlement to be fair for several reasons:

> One is . . . the bank is reducing its claim, capping its claim at $12 million, which results in a shifting of the percentage ultimate distribution to unsecured creditors. . . . I think we have a good fraudulent conveyance case in the Dennis Johnson case. I think we have a very good case against Noble Energy or Vitol in Sabbatical. And there may be some other claims. . . . Special counsel has agreed to limit their claim to $271,000 if paid fairly quickly. And that prevents the greater exposure to the estate and making the estate perhaps administratively insolvent . . . . So, it increases the percentage. It limits the administrative claim. And it solves some issues in the

> case. . . . I have serious concerns about prevailing in the [District Court Action] for
> a few reasons.  One, is simply there are some good documentary defense by the
> defendants in that case.   And another issue is simply my concerns with the
> credibility of Dennis Johnson which I think in my opinion prompted special counsel
> to withdraw . . . . [T]here is a likelihood that anything that really relied upon Mr.
> Johnson's testimony would be ignored by a jury.

[Dckt. 1308, pp. 59-60].  When asked about the consequences of not succeeding on the

compromise, Mr. Fluharty explained as follows:

> I think if we don't resolve this compromise, I lose the compromise.   I lose the
> money coming in to resolve my special counsel's fees.   I lose their agreement to
> take less than $600,000.  I lose the seed money to fund litigation in Sabbatical.  I
> lose the seed money to fund the fraudulent conveyance in the Dennis Johnson case.
> And I lose the $200,000 that is going to be loaned to help cover administrative
> costs.

[Dckt. 1308, pp. 81-82].

Mr. Fluharty noted that he explored other options before formulating the Fluharty

Motion to Compromise.  He attempted to sell the District Court Action, but the potential purchaser

was ultimately not interested.   Dennis Johnson may have attempted to find someone to buy the

claims, but that did not pan out.  Mr. Fluharty discussed selling the claims to several other entities,

including Peoples.

In Mr. Fluharty's opinion, the real value left in the Coal Enterprise cases lies in the

adversary proceedings initiated against the various trusts and the Noble and Vitol companies.  It

does not lie with the District Court Action.  The fraudulent conveyance action against the trusts is

based on Mr. Johnson's transferal of virtually all of his personally-owned real property leading up

to the bankruptcy filings.  In that case, Mr. Fluharty would either have to prove that Mr. Johnson

was insolvent at the time of the transfers or he would have to prove actual fraud.  He admitted on

cross-examination that such a showing would be "tricky" in the face of the Final Appraisals and,

thus, recovery is not guaranteed.  [Dckt. 1362, pp. 27-28].

Mr. Fluharty opined that he thought the fraudulent transfer suit was worth approximately $2 million, based mostly on the value of a CVS Pharmacy property and some other marketable locations in downtown Huntington, including Marshall University student apartment buildings.[6] Mr. Fluharty estimated that he and his counsel would likely accumulate about $50,000 in attorney's fees in pursuit of the fraudulent conveyance litigation.

### 4.   Richard Weston

Mr. Weston is an attorney practicing in Huntington who has approximately 14 years of civil litigation experience. He was qualified as an expert to value the District Court Action. He was proposed by Denise Johnson as Plaintiff's Counsel in her Upset Bid. Mr. Weston would take the case on a 50% contingency fee, with 5% going to Special Counsel. Prior to his testimony, Mr. Weston reviewed several pleadings in the District Court Action and "talked to a lot of people about the case," including Dennis and Denise Johnson. [Dckt. 1308, p. 94]. He also reviewed the District Court's memoranda opinions denying Peoples' Motion to Dismiss and Great American Insurance's Motion to Dismiss. He did not speak, however, with either Mr. Fluharty or his counsel, nor had he spoken with any representative of Peoples.

In discussing the logistics of the District Court Action, Mr. Weston estimated that the case would likely take about a year to litigate. He valued the case in a "[p]retty wide range of[,] say[,] between $20 million and $70 million." [Dckt. 1308, p. 100]. Mr. Weston based that assertion on several factors, including the existence of the RICO claim and potential RICO damages, along with the Final Appraisals. He opined that he would also have to take into account

---

[6]     Specifically, he discussed an offer he had received for the CVS building, which was somewhere between $3.5 and 4 million. The amount owed on the property totals approximately $2.8 to 3 million.

the fact that the mine leases were in default during the Final Appraisals in 2015 but had not done so to date.

When asked about the fee arrangement under which Special Counsel would receive 5% of Mr. Weston's 50% contingency fee in lieu of payment by Mr. Fluharty, Mr. Weston admitted that he did not have the agreement of Special Counsel for such an arrangement and had, in fact, never spoken with Special Counsel prior to the hearing. The imprecision and incomplete nature of Mr. Weston's investigation of the case causes the Court to disregard his testimony it its entirety.

### 5.     Denise Johnson

Denise Johnson is the wife of debtor Dennis Johnson and advocates the Upset Bid. The limited matters about which she testified do not factor into the analysis conducted by the Court within. In sum, the testimony was unhelpful.

### D.     Summary of Arguments

Mr. Fluharty seeks approval of the Fluharty Motion to Compromise pursuant to Federal Rule of Bankruptcy Procedure 9019.  He contends that the proposed compromise is both "fair and equitable" and in the best interests of the estates.  He asserts that he exercised his sound business judgment in negotiating the Fluharty Motion to Compromise, and he also believes it meets the standards found in governing precedent.

Denise Johnson contends that the Fluharty Motion to Compromise should be treated as a sale motion governed by 11 U.S.C. § 363, such that she would be able to present an "Upset Bid" and, essentially, buy the District Court Action from  Mr. Fluharty.

Lewis Glasser PLLC seeks in the LG Application compensation in the amount of $146,083.75. It contends such should be deemed an administrative claim for "efforts in seeking to preserve value for the benefit of creditors in this case . . . ." [Dckt. 1237, p. 4]. Upon review of the LG Application, and in light of the rulings found within, the Clerk is directed to schedule a further hearing on this final matter.

## II.

### A.    Legal Standard

In bankruptcy cases, settlements are governed by *Federal Rule of Bankruptcy Procedure* 9019. Under that rule, "On motion by the trustee and after notice and a hearing, the court may approve a compromise or a settlement." Fed. R. Bankr. P. 9019(a).

Court have acknowledged that "[c]ompromise and settlements are 'a normal part of the process of reorganization.'" *Arrowsmith v. Mallory (In re Health Diagnostic Laboratory, Inc.)*, 588 B.R. 154, 161-62 (Bankr. E.D. Va. 2018) (quoted authority omitted) (*quoting Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968) (internal quotation marks omitted). "The primary purpose of a compromise settlement is to avoid the necessity of determining sharply contested and dubious issues," and "[t]he settlement of time-consuming, burdensome, and uncertain litigation – especially in the bankruptcy context – is encouraged." *Wil-Rud Corp. v. Lunch* (*In re California Assoc. Prods. Co.*), 183 F.2d 946, 949-50 (9th Cir. 1950); *Arrowsmith*, 588 B.R. at 169; *see also In re Clements Manufacturing Liquidation Company, LLC*, 581 B.R. 218, 221 (Bankr. E.D. Mich. 2018); *HSBC Bank USA, N.A. v. Fane (In re MF Global Inc.)*, 466 B.R. 244, 247 (Bankr. S.D.N.Y. 2012) (citing *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996)); *In re Dewey & LeBoeuf LLP*, 478 B.R. 627, 640 (Bankr.

24

S.D.N.Y. 2012)(citing *MF Global Inc.*, 466 B.R. at 247); *Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 455 (2d Cir. 2007); *Buckeye Check Cashing, Inc. v. Meadows (In re Meadows)*, 396 B.R. 485, 499 (6th Cir. BAP 2008).

While "compromises are favored in bankruptcy, courts are not 'to give rubber stamp approval' of settlements." *In re D&D Distributors*, No. 14-bk-00565, 2016 WL 4821257, at *2 (Bankr. N.D. W. Va. Sept. 12, 2016) (Flatley, C.J.) (quoting *Official Comm. of Unsecured Creditors v. White Plains Joint Venture (In re Bond)*, 1994 U.S. App. LEXIS 1282, at *2 (4th Cir. Jan. 1994)); *Reynolds v. C.I.R.*, 861 F.2d 469, 473 (6th Cir. 1988).

"The decision whether to approve a compromise under Bankruptcy Rule 9019 is committed to the sound discretion of the Court." *Arrowsmith*, 588 B.R. at 162. In evaluating a compromise, a court must make "an informed, independent judgment" of whether the proposal is "fair and equitable," and in doing so, compare the settlement terms with the likely rewards of litigation. *Anderson*, 390 U.S. at 424-25; *Arrowsmith*, 588 B.R. at 162. A settlement or compromise can be approved "so long as it does not fall 'below the lowest point in the range of reasonableness.'" *In re Alpha Natural Resources, Inc.*, 544 B.R. 848 (Bankr. E.D. Va. 2016) (*quoting In re Austin*, 186 B.R. 397, 400 (Bankr. E.D. Va. 1995)); *Arrowsmith*, 588 B.R. at 162. Importantly, "the settlement may be approved even if the court finds it likely that the trustee would ultimately succeed in the litigation." *Austin*, 186 B.R. at 400.

The proponent of the compromise bears the burden of showing the proposed accord is in the best interest of the estate. *In re* Frye, 216 B.R. 166, 170 (Bankr. E.D. Va. 1997) (*citing In re Parkview Hospital – Osteopathic Medical Center*, 211 B.R. 603, 608 (Bankr. N.D. Ohio 1996)). In assessing the fairness and equity of the compromise, four factors are considered:

1.      The probability of success in litigation;

2.  The potential difficulties in any collection;

3.  The complexity of the litigation and the expense, inconvenience, and delay necessary in attending it; and

4.  The paramount interest of the creditors.

*Arrowsmith*, 588 B.R. at 162; *In re MCSGLobal Inc.*, 562 B.R. 648, 654 (Bankr. E.D. Va. 2017);

*In re Essex Construction, LLC*, 575 B.R. 648, 652-53 (Bankr. D. Md. 2017). Courts have also

given "significant weight" to a "trustee's informed analysis of the potential litigation along with

his extensive experience as a bankruptcy trustee and lawyer . . . ." *See Austin*, 118 B.R. at 401

(citing *In re Culmtech, Ltd.*, 118 B.R. 237, 239 (Bankr. M.D. Penn. 1990)).

Aside from these customary considerations, the "Motion to Treat as Sale" and the

putative Upset Bid raise another issue. There is some authority for a litigation claim settlement

being considered not only under the familiar Rule 9019 rubric but also under 11 U.S.C. § 363 as

"a disposition of estate assets." *See*, *e.g.*, *Cadle Co. v. Mims (In re Moore)*, 608 F.3d 253, 266 (5th

Cir. 2010). With due regard for this line of authority, our Court of Appeals has not spoken on the

matter. The Court is disinclined to deviate from the usual Rule 9019 process without guidance

from that superior tribunal, the Supreme Court or Congress. Until such guidance is forthcoming,

if ever, settlements in this Court are governed by Rule 9019(a), and the Court would have no

occasion to consider issues involved in a § 363 sale unless or until the proposed settlement is

disapproved.

**B.    Analysis**

The analysis begins with a measure of deference to Mr. Fluharty. He has three

decades of experience as a trustee. He became the nerve center of the Coal Enterprise entities from

the moment he entered the case. In sum, he took the reins amidst chaos and engineered a path

forward with good results. Foremost, he righted the ship from an environmental standpoint and then negotiated a complex sale of coal-related assets at a most difficult time in the coal industry. He did so despite Mr. Johnson's obstruction of his efforts. Importantly, while noting some necessary speculation is involved, he believes the proposed settlement would result in doubling the payout percentage to unsecured creditors. There are thus good reasons for sustaining his exercise of business judgment under the circumstances.

Moving to the applicable factors, the probability of success in the District Court Action appears slim at best. Those with significant expertise in predicting the outcome of a case will often telescope multifaceted litigation down to its essence. The process mimics what the finder of fact might be expected to do in its assessment of the case from a top-down perspective. Mr. Fluharty did so here with his cogent inquiry of Special Counsel: "[W]hat if a jury would not believe anything that Dennis Johnson said . . . . What is there that we could prevail upon?" [Dckt. 1308, p. 47]. Lest there be any doubt where he stood on the matter -- and after having interacted with Mr. Johnson, becoming deeply involved in the estates, and immersing himself in the basis for the District Court Action -- he answered his own inquiry as follows: "[T]here is a likelihood that anything that really relied upon Mr. Johnson's testimony would be ignored by a jury." [Dckt. 1308, pp. 59-60]. There is simply no basis to question either his superior vantage point on the matter or the basis for his underlying opinion concerning where the outcome of the litigation would fall.

Next, respecting the potential difficulties in collection, the defendants in the District Court Action would be expected to pay any settlement or judgment resulting. But this factor begs the question when the prospects on the first factor are so impaired, as here.

Concerning the complexity of the litigation and the expense, inconvenience, and delay necessary in attending it, much work remains to be done in the District Court Action, not the

27

least of which is developing a complete evidentiary record, preparing multiple dispositive motions and engaging in other pretrial activities, along with an inevitable trial that may last weeks rather than days. The road ahead for the parties, lawyers, the presiding district judge and the jury is daunting indeed and littered with the potential for abundant obstacles, not the least of which is considerable delay as the case develops.  With the prospects for success so limited, one begins to appreciate how Mr. Fluharty's decision on this matter took shape.

The final factor is the paramount interest of the creditors. There is a real prospect that the further dissipation of resources resulting from the District Court Action will result in an administratively insolvent estate. It is also worth considering Mr. Fluharty's further observations concerning the effects resulting from disapproval of the proposed settlement:

> I think if we don't resolve this compromise, I lose the compromise.  I lose the money coming in to resolve my special counsel's fees.  I lose their agreement to take less than $600,000.  I lose the seed money to fund litigation in Sabbatical.  I lose the seed money to fund the fraudulent conveyance in the Dennis Johnson case.  And I lose the $200,000 that is going to be loaned to help cover administrative costs.

[Dckt. 1308, pp. 81-82]. These considerations weigh significantly in the balance, indicating the proposed compromise and settlement is prudent.

Having considered the applicable factors, and the entirety of the evidentiary record, the Court concludes that the Fluharty Motion to Compromise is fair and equitable and in the best interests of the estate. **IT IS ORDERED** that Fluharty Motion to Compromise be, and hereby is, **GRANTED**. The Movant may supply a supplemental proposed order reflecting this same relief to the extent deemed necessary to give full effect to the proposed compromise and settlement.

**IT IS FURTHER ORDERED** that Motion to Treat as Sale be, and hereby is, **DENIED** and the putative Upset Bid disregarded as a fugitive document.

**IT IS FURTHER ORDERED** that, in view of these rulings, the Clerk be, and hereby is, directed to reset forthwith the LG Application for a further hearing.